*844 CLAY, Circuit Judge,
concurring.
I concur in the majority opinion. I write separately to highlight certain facts that demonstrate the sufficiency of the evidence underlying the most significant charge in this case, Defendants’ conspiracy to defraud the United States of tax revenue by classifying income from WeShare as loans that would never have to be repaid, in violation of 18 U.S.C. § 371.
The evidence showed that Carl Woodman was a co-owner of WeShare and that Robert Woodman was responsible for WeShare’s payroll tax withholdings as well as its bookkeeping. By 1995, James Woodman was WeShare’s general manager, responsible for, inter alia, signing all payroll checks. IRS Special Agent Perry Mastrocola testified that his investigation of WeShare uncovered a four-year history of monetary transfers from WeShare to all three Defendants, either directly or indirectly through numerous shell corporations that Defendants owned or controlled: WAR (by Thomas Warholic); CCPA (by Robert Woodman); WJC (by Warholic and Carl Woodman); Creative Marketing Management (by Warholic 'and Carl Woodman); Basic Telecommunications Auditors, Inc. (by Robert Woodman); Basic Business Auditors (by James Woodman); and Basic Bookkeeping (by James Woodman). Sharon Hemsath, a former WeShare employee, testified that Carl Woodman and/or Robert Woodman had instructed her to write cheeks to these various companies as payment for their “consulting fees.” They then used these payments for personal expenses.
The evidence further showed that Defendants schemed together to avoid their personal income tax obligations by classifying payments from WeShare directly, or indirectly through the above-described corporations, as loans instead of as salaries. Defendant Warholic testified that, upon the suggestion of Robert Woodman, WAR, Inc. “was a company put together so that [he] could keep track of the money [he] was making from WeShare and put together to avoid paying taxes actually.” Warholic further explained that he, Robert Woodman, and Carl Woodman had a meeting in which it was agreed that their income from WeShare would be booked as loans. Although Warholic added that Woodman said that at some point they would pay taxes on these loans, Warholic noted that he did not think of the payments as loans because they would not have to be repaid until some uncertain date in the future. In addition, Robert Woodman stated that, at the time the taxes would be paid, WeShare (not Defendants themselves) would pay Defendants’ personal tax liabilities on their behalf.
The jury could have found this evidence sufficient to show that Carl Woodman, Robert Woodman, and James Woodman, along with Warholic, conspired to defraud the United States of tax revenues. Carl, Robert, and James Woodman all had significant control over WeShare’s financial affairs: Carl was a co-owner; Robert controlled the payroll taxes and bookkeeping; and James was the general manager. All of the defendants also owned or controlled the bank accounts of at least one corporation that, according to Warholic, Robert Woodman had advised that they set up in order to receive these alleged loans from WeShare. The jury could have concluded that Defendants knew that they were not receiving loans from WeShare or related corporations because there were no loan agreements, no requirement that Defendants pay interest, and no evidence that Defendants had to pay these “loans” back at any point in time. Thus, the jury rationally could have concluded that Defendants intended to deprive the United *845 States of tax revenue that attached to their income from WeShare.